RICHARD M. OBERTO
ATTORNEY AT LAW
Cal. State Bar No. 247285
516 W. Shaw Ave. Ste 200
Fresno, California 93704
Telephone: (559) 221-2557

Attorney for the defendant,
Christopher Jeorge Millican

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   *Plaintiff*,<br><br> v.<br><br>CHRISTOPHER JEORGE MILLICAN,<br><br>   *Defendant*. | No. 1:20-cr-00040<br><br>SENTENCING MEMORANDUM BY THE DEFENDANT CHRISTOPHER JEORGE MILLICAN<br><br>Hearing Date: 11/3/2022<br>Hearing Time: 11:30 a.m.<br>Courtroom: 4<br>District Judge: Dale A. Drozd |

**To the United States District Court for the Eastern District of California, the United States Attorney's Office for the Eastern District of California, and the Probation Department for the Eastern District of California:**

  Please accept this as the Sentencing Memorandum by the defendant CHRISTOPHER JEORGE MILLICAN ("Mr. Millican"). Contrary to the Presentence Report ("PSR") finding, the present case does not justify a five-level enhancement under the United States Sentencing Guidelines ("USSG") for engaging in a "pattern" of activity involving prohibited sexual conduct. Dkt No. 87-1, PSR, p. 10, para. 42; Dkt No. 88, Formal Objections to PSR, p. 4; USSG, sec. 4B1.5. With that enhancement excluded, Mr. Millican requests a sentence not to exceed 235 months, which is the low-end of the applicable advisory sentencing range at a total offense level of 38 and a criminal history category of I. A sentence not exceeding 235 months, or nearly 20 years, finds support in all of the applicable sentencing factors under 18 U.S.C. 3553(a). If the court finds that the enhancement under USSG section 4B1.5 does apply, the applicable sentencing factors do not justify consecutive sentences.

  Following the imposition of judgment, Mr. Millican's current defense counsel will

1

request to withdraw as attorney of record and move for the court instead to appoint Criminal Justice Act panel attorney Kristi Ann Hughes ("Ms. Hughes"), Law Office of Kristi A. Hughes, P.O. Box 141, Cardiff, CA 92007, 858-215-3520.  Ms. Hughes has agreed to accept appointment as Mr. Millican's attorney for appeal.

The PSR includes an "institutional recommendation" for incarceration at the BOP facility in Seagoville, Texas.  Dkt. No. 87-1, p. 5.  The recommended institution is one of nine BOP facilities that offers specialized programming for sex offenders.  Meanwhile, the location in Texas would facilitate Mr. Millican's contact with his family.  His wife and children have already moved back to Texas, and he anticipates that his mother will move back to Texas following his sentence.

### I. Mr. Millican experienced poverty, neglect, and abuse as a child.

Mr. Millican grew up in Amarillo, Texas, with little money and little parental support.  He decided to join the Navy in 2014 when he was 20 years old and overheard a military recruiter talking to people at a local MacDonald's.  At the time, he was working as an automotive technician for Walmart, changing oil and tires, and earning $8/hour.  He trained in the Navy to work as an airplane technician and received orders in 2017 to serve at the Naval Air Station in Lemoore ("NAS Lemoore").  In 2018, he served his first deployment, which was aboard an aircraft carrier overseas.  Meanwhile, his first child was born in 2016, and his wife developed type I diabetes during the pregnancy.

As the PSR summarizes, Mr. Millican experienced substantial hardship as a child.  Dkt. No. 87-1, PSR, pp. 11-12, paras. 58-61.  After years of fighting, Mr. Millican's parents separated when Mr. Millican was nine years old.  *Id.*, pp. 11-12, para. 59.  The fighting escalated to the point that his mother ran away fearing for her life and took Mr. Millican and his siblings with her.  *Id.*  For the next few years, Mr. Millican lived in several different states and in Mexico, as his mother took the children wherever her romantic relationships led her.  *Id.*  His mother's romantic relationships always turned abusive, and the family on several occasions spent time in homeless shelters.  *Id.*

Mr. Millican remained under his mother's care until he was thirteen years old and

returned to live his father. Dkt. No. 87-1, PSR, pp. 11-12, paras. 60. For the rest of Mr. Millican's teenage years, he seldom talked his mother and saw her at most one time. *Id.* Mr. Millican's father tended to keep to his bedroom and ignore any parental duties. *Id.* Mr. Millican saw glass pipes that his father appeared to use for smoking methamphetamine. *Id.* Mr. Millican started working during his senior year of high school, as he saw that otherwise, his father could not buy food and clothes for Mr. Millican and his siblings. *Id.* Despite having a sound intellect, Mr. Millican barely graduated high school with "special needs" diploma. He fell behind on credits as he was working fifty hours a week during his senior years. He applied for the special needs diploma when the alternative was to redo the whole school year.

**II.     The alleged offending occurred as Mr. Millican was struggling to meet the demands of work, deployment, and family life.**

A career in the Navy promised a way for Mr. Millican to gain specialized work skills, prove his merit, and place himself on a stable financial footing. He wanted to follow in the path of his grandfather, who served in the Armed Forces as an Aviation Machinist Mate. During his initial training, he wondered how he could get his head around all the different tools he would need to use. When he was assigned to NAS Lemoore, he felt the constant stress that if he did not perform his work correctly, his error could endanger the pilot flying the plane. In 2018, his deployment aboard an aircraft carrier called the USS Truman only raised the stakes for his work performance. The deployment to some extent simulated a real combat mission, and his superiors were watching more closely to evaluate his performance.

Despite the rigors of work, Mr. Millican embraced his role as a husband and father. During work at NAS Lemoore, his wife sometimes needed help with complications related to her diabetes. He and his wife had some recurring disagreements about his personal spending and internet use. He spent time in the "cooling off" barracks at NAS Lemoore, but never had problems with domestic violence. Dkt. No. 87-1, PSR, p. 13, para. 69. At the urging of some family members, Mr. Millican acknowledged that he had some

narcissistic tendencies or that, in more common terms, he behaved selfishly on some occasions. Whatever the terminology, he wanted to address the problem and sought counseling. *Id.*, para. 66. He did manage to earn three different medals over the course of his service in the Navy. Dkt. No. 87-1, p. 14, para. 74.

### III. Mr. Millican demonstrated characteristics consistent with youthful offending, including immaturity and impulsivity.

During Mr. Millican's lengthy interrogation, he repeatedly showed characteristics associated with youthful offenders. He described circumstances where he failed to appreciate all the harm that he allegedly caused, wanted treatment, and acted out despite wanting to adhere to what he knew was right.

The United States Supreme Court, state courts, and state legislatures across the country have recognized that when assessing a defendant's culpability, young people are different. *Roper v. Simmons*, 543 U.S. 551, 570 (2005); *Graham v. Florida*, 560 U.S. 48, 69 (2010); *Miller v. Alabama*, 567 U.S. 460, 471-472, 478 (2012); *People v. Caballero*, 55 Cal.4th 262, 267 (Cal. Supreme Ct. 2012); Cal. Pen. Code, sec. 3015. The California Supreme Court in *Caballero* explained as follows regarding the import of recent United States Supreme Court opinions addressing the diminished culpability of juvenile offenders:

> The high court stated that nonhomicide crimes differ from homicide crimes in a "moral sense" and that a juvenile nonhomicide offender has a "twice diminished moral culpability" as opposed to an adult convicted of murder — both because of his crime and because of his undeveloped moral sense. (*Graham*, *supra*, 560 U.S. at p. ___ [130 S.Ct. at p. 2027].) The court relied on studies showing that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence. [Citations.] Juveniles are [also] more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults." (*Id.* at p. ___ [130 S.Ct. at p. 2026], quoting *Roper v. Simmons* (2005) 543 U.S. 551, 570.)

*Caballero*, 55 Cal.4th at 267. Based on the United States Supreme Court precedents, *Caballero* recognized that a life without parole sentence for juvenile nonhomicide offenders was unconstitutional. *Id.* Following *Caballero*, the California Legislature enacted the right to a youth offender parole hearing for offenders who have served 15, 20, or 25 years in custody, depending on the original sentence imposed. Cal. Pen. Code, sec.

3051. The California Legislature expanded on the rule in *Caballero* and related United State Supreme Court precedents by providing access to youth offender parole hearings not only for juvenile offenders, but also for adult offenders 25 years of age and younger. *Id.*

In the present case, Mr. Millican was 25 years old at the time of the alleged offending. Under California law, he would have the right to a youth offender parole hearing in 15, 20, or 25 years, depending on the actual sentence imposed. While federal law might be different, that only means the court must consider Mr. Millican's diminished culpability all the more closely at the initial sentencing. Federal law does not provide for anything akin to a youth offender parole hearing later down the road.

During Mr. Millican's interrogation, he displayed thinking that was typical of youthful offenders. He did not appreciate the severity of the alleged conduct. He understood the allegations were serious, but thought he could salvage his military career by going away a while for treatment, likening himself to a cadet who turns suicidal or has a mental breakdown. He considered the alleged conduct part of an addiction that he hated, but could not stop at the time. Some older offenders in Mr. Millican's same position might have expressed similar feelings. Mr. Millican did enjoy some important trappings of adulthood, including a military career, challenging job, and his own family. Nonetheless, Mr. Millican statements during his interrogation showed an immaturity and impulsivity that was typical of youthful offenders.

**IV.  The sentencing factors under 18 U.S.C. 3553(a) do not support a punishment exceeding a low-end advisory sentence of 235 months.**

None of the factors under 18 U.S.C. 3553(a) support a sentence exceeding the low-end of the applicable USSG advisory sentencing range. Mr. Millican's history and characteristics present as mitigating factors. As a child, he experienced poverty, parental neglect, and abuse. As an adult, he was generally heading in a productive and law-abiding direction, except that contrary to everything he really wanted, there was the alleged offending here.

The alleged offending did inflict substantial harm on the complaining witness who

testified. That harm, however, does not warrant a sentence exceeding 235 months in prison, which provides an ample enough time-frame to achieve every legitimate objective of sentencing. The custody time would be more than enough for Mr. Millican to complete sex offender treatment. Upon release, Mr. Millican would be subject to a lifetime of supervision, which would provide every reasonable assurance that he does not reoffend.

If the court does find that the five-level enhancement applies under USSG section 4B1.5, none of the factors under 18 U.S.C. 3553(a) support a consecutive sentence based on the two counts involving the same conduct in this case. As explained in Mr. Millican's formal objections, a consecutive sentence for the receiving in count two would create a gross disparity in sentencing among defendants with similar records. Dkt No. 88, Formal Objections, p. 4; 18 U.S.C. 3553(a)(6). A defendant who commits the sexual exploitation alleged in count one normally wants to receive or see that someone else receives the resulting image. A consecutive sentence for the receiving would create a gross disparity in sentencing based on the prosecutor's election to charge one or more counts of receiving to accompany the core charge of sexual exploitation.

## V.     Conclusion.

For the reasons stated, the court should impose punishment not to exceed a low-end advisory sentence of 235 months. If the court finds that the five-level enhancement under USSG section 4B1.5 does apply, the court should not impose a consecutive sentence for the receiving count. A consecutive sentence would have no justification under 18 U.S.C. 3553(a) and would create a gross disparity in sentencing among offenders convicted of similar sexual exploitation offenses.

DATED: 10/17/2022                  */s/ Richard M. Oberto*
                                   RICHARD M. OBERTO
                                   Attorney for the defendant,
                                   Christopher Jeorge Millican